IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

BEVERLY K. ARMSTRONG,

        Plaintiff,

vs.                                   CASE NO.: 1:05cv205-SPM/AK

JAMES NICHOLSON, SECRETARY
UNITED STATES DEPARTMENT OF
VETERAN'S AFFAIRS,

        Defendant.
_____/

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

This cause comes before the Court on Defendant's motion for summary judgment (doc. 24). The parties have had the opportunity to fully brief the issues and to submit materials in accordance with Northern District of Florida Local Rules 56 and 7.1. For the reasons explained below, summary judgment will be granted for Defendant.

## I.    BACKGROUND[1]

Plaintiff, Beverly K. Armstrong, is suing her former employer for (1) failing

_____

[1] Many of the facts in this section are disputed by Defendant. The Court makes no finding on whether they are true. The facts are simply taken for purposes of summary judgment in the light most favorable to Plaintiff. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999)

to provide her with a disability accommodation, (2) retaliating against her for making a request for accommodation, and (3) harassment based on disability, age, and gender.  Ms. Armstrong is female and over 40 years old.  She was diagnosed with fibromyalgia in March of 1999 after suffering symptoms since the early 1980s.  In September of 2000, she was diagnosed with ulcerative colitis.

Ms. Armstrong worked at the Malcolm Randal V.A. Medical Center (VA) in Gainesville, Florida.  She was employed as a medical technologist in the microbiology lab.  The microbiology lab provides services for the VA and its patients 24 hours a day, 7 days a week.  The job entails preparing, monitoring, and analyzing cultures and samples, some of which are time-sensitive.  The microbiology lab employed four medical technologists and a lab supervisor. Each medical technologist was required to work one weekend shift each month.[2]

Ms. Armstrong worked at the VA  from September 1983 until February 1992, at which time she resigned because of the weekend shift and because she accepted a position at another hospital.  Ms. Armstrong returned to work at the VA from October 1994 until January 3, 2003, at which time she resigned again.

Ms. Armstrong contends that she was forced to resign because of workplace harassment and refusal to accommodate her disability.  Ms.

─────────────────────

[2]  Medical technicians or technologists in other lab sections that were operational only Monday through Friday helped to cover the microbiology and hematology labs over the weekend.  Doc. 24-18.

CASE NO.: 1:05cv205-SPM/AK

Armstrong's accommodation issue centers on the weekend shift; specifically the work load of the weekend shift and what she characterizes as the "haphazard" nature of the shifts.  The weekend shift included day shifts and evening shifts, and the rotation between weekend shifts was not constant.  Thus even though Ms. Armstrong regularly worked the day shift, she could be assigned to work an evening shift on a weekend.  Also, because the rotation for weekend shifts was not always the same, Ms. Armstrong at times had only one or two weekends off between weekends worked.[3]  At other times, Ms. Armstrong could be off three to five weekends in a row.  According to Ms. Armstrong, the work load for the employees on the weekend shift was heavier than the work load during the week, which added to her stress and fatigue.  A single medical technologist or technician covered each weekend shift, so on weekends when the lab was busy, the entire burden for a shift fell on that one person.

Due to her fibromyalgia, Ms. Armstrong had trouble recovering after a weekend shift, especially if she had only one weekend off in between to rest.  Ms. Armstrong also had trouble regularizing her sleep patterns after working evening shifts on the weekend.  This is because an effect of her fibromyalgia is the inability to sleep.  The disruption to her regular sleeping schedule from

---

[3]  An employee working the weekend shift would still receive two days off, but the days would be during the week, such as the Thursday before the weekend shift and the Monday after the weekend shift.  See doc. 24-14 at 47.

CASE NO.: 1:05cv205-SPM/AK

working a weekend evening shift exacerbated the problem.  She also experienced added stress when working a weekend shift due to the workload and the lack of others on duty to help.

On Labor Day Weekend 2000, while working a weekend shift in the microbiology lab, Ms. Armstrong became acutely ill with abdominal pain and bouts of bloody diarrhea.  She stayed at her post and went to the emergency room of a local hospital after her relief worker came in.

Ms. Armstrong was diagnosed with ulcerative colitis.  Ulcerative colitis causes abdominal pain, frequent bowel movements, and stools mixed with blood and pus.  The disease affects the body's ability to obtain proper nutrition.

Beverlyn Franklin was the supervisor of the microbiology lab.  Ms. Franklin is female and over 40 years old.  She is alleged to have harassed Ms. Armstrong.

Ms. Armstrong complains that sometime between September 2000 and November 2000, Ms. Franklin told Ms. Armstrong that Ms. Armstrong "did not have the right thinking about her illness because if she did, she would not be sick."  Doc. 6 at p. 7, ¶ 17.  Ms. Franklin told Ms. Armstrong about her own illness while serving in the military and how she became better when she decided that she did not have time to be sick.  Ms. Armstrong found these comments to be offensive.

In November 2000, after her Labor Day illness, Ms. Armstrong took a six-

week medical leave of absence.  When Ms. Armstrong returned to work in January 2001, Ms. Franklin made a remark about Ms. Armstrong's weight loss, which Ms. Armstrong found offensive.[4]

Between February 2001 and April 2001, Ms. Armstrong had another acute onset of ulcerative colitis. Although there is some uncertainty about whether Ms. Armstrong took a 12-week medical leave of absence[5], Ms. Armstrong notes that she was having difficulty keeping up with her work because she was having to run to the restroom often.  Doc. 34 at 4.

Sometime in April 2001, Ms. Armstrong initiated a meeting with Ms. Franklin to discuss how her health problems were affecting her work and to inquire about any options her employer could provide to enable her to continue working.  At the meeting, Ms. Armstrong explained that she was fully capable of

_____

[4]  The Court has been unable to find in the record what it was Ms. Franklin said to Ms. Armstrong.  Regarding weight loss, however, Ms. Armstrong had lost 15 pounds when she returned to work in January 2001.  Doc, 36-89.  Ms. Armstrong explains in her affidavit that her illness has resulted in a 24 pound weight loss.  Doc. 37-6 at 39.  She is five feet three inches tall and weighs approximately 115 pounds. Id.

[5]  The issue is not material.  The Court notes, however, that in her response to summary judgment, Ms. Armstrong contends that she worked throughout the entire time and criticizes the Government for making a misstatement of fact that she was unable to work for 12 weeks.  Doc. 34 at 4.  In her amended complaint, however, Ms. Armstrong alleges, "Between February 2001 and April 2001, ARMSTRONG had another acute onset of ulcerative colitis for an approximate twelve (12) week period and went out on medical leave of absence."  Doc. 6 at ¶ 19.

performing all essential functions of her job, but she also stated that working a weekend shift without any assistance was exacerbating the symptoms of her fibromyalgia and ulcerative colitis.  Ms. Franklin gave Ms. Armstrong a memorandum about light duty.  Doc. 36-57.

Ms. Armstrong received additional information from Ms. Franklin on October 10, 22, and 25, 2001, concerning light duty assignments.  Doc. 36-37 at 2-4.  Ms. Franklin told Ms. Armstrong in an email that it was up to her to get started.  Doc. 36-37 at 3.  Ms. Franklin advised in one email that if the lab had light duty, the work would likely require more weekend shifts.  Doc. 36-37 at 2.  Ms. Franklin advised in another email that "DR. CROKER EXPECTS A FULL LEVEL OF WORK OUT OF EACH EMPLOYEE."  Doc. 36-37 at 4.  Ms. Armstrong notes in her complaint that the statement was made in all capital letters (doc. 6 at ¶ 23), albeit the entire email is written in capital letters.  Ms. Armstrong viewed these emails as harassing because she did not request or need light duty work as an accommodation.  Instead, Ms. Armstrong reiterates that her work issue concerned the weekend shift.

In November 2001, Ms. Armstrong requested overtime payment for work already performed during a weekend shift she had been assigned.  The overtime payment was refused because the overtime had not been approved in advance. According to Ms. Armstrong, other workers were paid for overtime work during weekend shifts even when the overtime had not previously been approved.

Ms. Franklin addressed the overtime issue with Ms. Armstrong on November 19, 2001.  During the discussion, Ms. Franklin told Ms. Armstrong that she needed to cover the work of the 7:30 a.m. to 4:00 p.m. shift to avoid creating overtime for them.  Ms. Franklin told Ms. Armstrong, whose shift began at 8:00 a.m. and ended at 4:30 p.m., that from 3:45 to 4:00 p.m. she was required to finish the work that the earlier shift had started so that her co-workers did not have to work beyond 4:00 p.m.  According to Ms. Armstrong, no one finished Ms. Armstrong's work and if there was work remaining at the end of her shift, she would often stay past 4:30 p.m. to complete the work.

Ms. Franklin told Ms. Armstrong that co-workers had complained about doing Ms. Armstrong's work.  Ms. Franklin would not provide any details, however, and when Ms. Armstrong questioned her co-workers, they denied making complaints.

During the overtime discussion, Ms. Franklin told Ms. Armstrong that she should not need overtime on the weekend and questioned Ms. Armstrong about why she did not finish her work as quickly as her co-workers.  Ms. Franklin accused Ms. Armstrong of not doing anything about her health problems, which resulted in slowed work performance.  According to Ms. Armstrong, Ms. Franklin was hostile and offensive.  She barraged Ms. Armstrong with questions about her health problems, but she did not give Ms. Armstrong the opportunity to respond to her questions or to explain her request for overtime.  Ms. Armstrong left in

CASE NO.: 1:05cv205-SPM/AK

tears.

On December 14 and 15, 2001, Ms. Armstrong asked Ms. Franklin to explain why she personally attacked Ms. Armstrong on November 19, 2001. According to Ms. Armstrong, Ms. Franklin refused to give an explanation. Ms. Armstrong and Ms. Franklin exchanged several email messages, however. Ms. Franklin explained to Ms. Armstrong that confidential complaints made to her by co-workers would remain confidential. She explained to Ms. Armstrong that Ms. Armstrong's work performance was acceptable. She also explained to Ms. Armstrong that she had to treat Ms. Armstrong the same way she treated other employees. She could not give Ms. Armstrong special treatment for illness without proper documentation and adherence to VA requirements. Doc. 36-45 at 4-7.

In December 2001, Ms. Franklin sent emails to her superiors in which she stated that Ms. Armstrong's co-workers were complaining about her work. Docs. 36-56 and 36-57. Ms. Franklin explained in an email that Ms. Armstrong "has not made any errors. She is just working very slow. . . . Some people will take their time doing work because they know someone is going to help. After a while, you can see the slow work is deliberate." Doc. 36-57.

Ms. Armstrong was concerned that Ms. Franklin was retaliating against her. So on January 3, 2002, she made a written request that Ms. Franklin provide her with any documentation or records containing Ms. Armstrong's name

or social security number.  In response, Ms. Franklin gave Ms. Armstrong her personnel folder, but no other documentation.  Doc. 24-13 at ¶ 7-8.  Ms. Armstrong reiterated her request by email and asked Ms. Franklin to provide withheld documentation regarding her health condition.  On January 15, 2002, Ms. Franklin provided Ms. Armstrong with six Reports of Contact (ROC).  Id. Ms. Armstrong contends that the ROCs contained false information regarding her interactions with Ms. Franklin.  Although these ROCs were not included in Ms. Armstrong's personnel file and resulted in no adverse action against her, Ms. Armstrong finds them objectionable.  According to Ms. Franklin, the ROCs are not significant and are simply a means for supervisors to record their recollections.  Ms. Armstrong continued to receive favorable performance evaluations from Ms. Franklin and she suffered no loss in pay or benefits.

On January 24, 2002, Ms. Armstrong provided to Ms. Franklin written documentation disputing the six ROCs.  Ms. Franklin stood by her ROCs in a response to Ms. Armstrong dated February 1, 2002.  Doc. 24-13 at 22-23. Although Ms. Armstrong complained to Ms. Franklin's supervisor, Joan Hart, the ROCs were not changed.  Doc. 24-13 at 25, and doc. 36-65.

On January 24, 2002, Ms. Armstrong also provided Ms. Franklin with a written request for accommodation and a letter from her doctor.  The letter, dated January 18, 2002, from Dr. John Abernathy, explains that Ms. Armstrong suffers from fibromyalgia and ulcerative colitis.  Doc. 24-14 at 22.  The fibromyalgia

"causes difficulty walking, labored breathing, chronic pain, concentration problems, fatigue, sleep problems, and headaches." Id.  The ulcerative colitis "causes cramping and bowel disorders." Id.  Dr. Abernathy stated that the conditions are severe and affect Ms. Armstrong's "major life activities." Id.  He also stated that "[j]ob stress and workload causes the conditions to worsen." Id.  Dr. Abernathy suggested that Ms. Armstrong's conditions could be managed with "periodic rest periods, reducing physical exertion, and reducing workplace stress." Id.  He also "suggest[ed] that she not worsen her condition by working weekend shifts." Id.

Between January 24, 2002, and February 4, 2002, Ms. Armstrong received several emails and notes concerning the scheduling of a reasonable accommodation meeting.  Ms. Armstrong complains that in one email, Ms. Franklin stated that she would listen to Ms. Armstrong, but would have nothing to say.[6]

In response to Ms. Armstrong's request for accommodation and the letter from Dr. Abernathy, on January 25, 2002, the lab chief, Dr. Croker, sent a memorandum to human resources.  Doc. 24-14 at 23.  He noted that he deemed Ms. Armstrong to be requesting light duty work and that the lab had no light duty

---

[6]  The text of the email reads: "Bev, The only thing Joan and I are going to do is listen to your list.  There is nothing for us to say, but we will write your requests.  We [would] like to have this meeting on Tuesday morning."  Doc. 36-5.

positions.  Id.  He also noted that excusing Ms. Armstrong from the weekend shift

was not feasible given the workload of the lab generally.  Id.  As alternative

options, Dr. Croker suggested offering Ms. Armstrong the midnight shift because

the workload is usually lighter.  Id.  He also suggested that Ms. Armstrong

undergo a fitness for duty evaluation.  Id.

Ms. Armstrong had a meeting on February 5, 2002, with Ms. Franklin and

Ms. Hart.  She explained that the weekend work was exacerbating her

fibromyalgia and ulcerative colitis.  She contended that the workload was heavier

on the weekends.  She explained to Ms. Franklin and Ms. Hart that a weekend

shift was more strenuous because only one medical technologist was on duty.

She also explained that because of her disabilities, it was difficult for her to

recover from the strain of the weekend duty, even though it was only once a

month.  Ms. Armstrong suggested accommodations such as (1) periodic rest

periods, (2) removal from the weekend shift rotation, (3) consecutive days off

during the week following a weekend shift, and (4) additional staff support during

the weekend shift.

Ms. Armstrong requested, by letter dated February 5, 2002, that any

further communication by management toward her "be given verbally and in

writing."  Doc. 24-13 at 13.  Ms. Armstrong complains, however, that neither Ms.

Franklin nor Ms. Hart asked Ms. Armstrong for more information regarding her

medical condition, nor did they offer any ideas or suggestions regarding

accommodations.

On February 5, 2002, human resources sent a letter to Dr. Abernathy requesting more information about Ms. Armstrong.  Doc. 24-14 at 24.  Included was Ms. Armstrong's job description and a release[7] that authorized Dr. Abernathy to provide medical information to human resources.  Id.  Dr. Abernathy was asked to provide details about the work Ms. Armstrong could perform and the work she could not perform.  Id.  He was advised that the workload on the weekend shifts was comparable to the workload during the week.  Id.  Dr. Abernathy was asked to specify what his concern was with Ms. Armstrong working the weekend.  Id.

In a response dated February 14, 2002, Dr. Abernathy explained that Ms. Armstrong can perform her duties.  Doc. 24-14 at 34.  He stated that the problem was "fatigue and stress caused by work overload."  Id.  He explained that Ms. Armstrong "could probably handle the regular week workload.  However, the additional workload of the weekend will cause extra fatigue and does not allow her time for recovery from the work week."  Id.  His "specific recommendation [was] to reduce this workload."  Id.

In late February 2002, Ms. Armstrong perceived that she was being monitored and that she was under heightened scrutiny by Ms. Franklin and other

---

[7] Ms. Armstrong eventually signed the release, but later withdrew it.  Doc. 24-15 at ¶2, doc. 24-16.

CASE NO.: 1:05cv205-SPM/AK

management personnel.  On February 27, 2002, Ms. Franklin spoke to Ms.

Armstrong about working on her case during time she should be performing

patient care.  Doc. 24-13 at ¶ 15R.  According to Ms. Franklin, Ms. Armstrong

was not in her work area during her appointed time.  Instead, she was meeting

with Martin Feuer[8] or the union.  She was on the telephone excessively.[9]  Other

medical technologists were doing parts of Ms. Armstrong's work.  Ms. Franklin

told Ms. Armstrong that any business Ms. Armstrong needed to take care of

regarding her issues at work needed to be accomplished during her lunch period,

break periods, or annual leave because Ms. Armstrong was not a bargaining unit

employee.

Ms. Franklin memorialized the conversation with an ROC that

characterized the encounter as a "verbal counseling."  Doc. 36-48.  The ROC

---

[8]  Mr. Feuer worked in Cytotechnology and shared an office with Susan A. Alvarez.  According to Ms. Alvarez, Ms. Armstrong frequently came by to see Mr. Feuer during working hours.  Mr. Feuer hinted that Ms. Armstrong was working on and EEO complaint and that he knew all about those as he had filed several (9 or 11).  They spent a lot of time talking.  See Doc. 24-29, Affidavit of Susan A. Alvarez.

[9]  According to co-worker Barbara Sittnick, on occasion Ms. Armstrong would stay on the phone for unusually long periods of time.  On two occasions, lab results from Lake City had to be called into other lines (histology and Ms. Franklin's office) because the phone line was tied up for several minutes.  Doc. 24-20, Affidavit of Barbara Sittnick.  Susan A. Alvarez in the cytotechnology section remembers taking a call in her office from someone trying to get lab results because the lab phone had been busy for an extended period of time.  See Doc. 24-29, Affidavit of Susan A. Alvarez.

noted that Ms. Armstrong had be absent from her workstation for extended periods several times on February 26, 2002, and had failed to inform Ms. Franklin.  Ms. Armstrong complains about Ms. Franklin's actions because Ms. Franklin should have been aware that her ulcerative colitis required her to make several trips to the restroom, sometimes for extended periods of time, when she was experiencing diarrhea and abdominal cramping.  Ms. Armstrong also notes that Ms. Franklin did not require any non-disabled employees to inform her when they left their work stations.

On February 27, 2002, Ms. Armstrong made an EEO complaint against the VA alleging hostile work environment, failure to accommodate her disability, and retaliation.  She signed a written complaint on April 15, 2002.  Ms. Armstrong complained that she continued to receive ROCs that misrepresented her interactions with Ms. Franklin and was harassed because of her request for accommodation.

Ms. Armstrong also complains that management began communicating with her almost exclusively in writing by issuing memoranda and letters that were often addressed to Ms. Armstrong's physician and her attorney.  By letter dated March 7, 2002, Ms. Armstrong made another written request for a disability accommodation.  Her letter included notice that she was being represented by Attorney Samuel A. Mutch.  Attorney Mutch notified the VA of his representation of Ms. Armstrong by letter dated March 20, 2002.  Doc. 24-16.  From that point

on, it does not appear that the VA was permitted to communicate directly with Ms. Armstrong or her physician.  Doc. 24-5 at 37 and 38-41.

On March 26, 2002, the VA's Chief of Human Resources and Management Services, Roberto R. Mejia, requested Attorney Mutch to provide further medical documentation of Ms. Armstrong's disability.  On April 16, 2002, Mr. Mejia provided Attorney Mutch with workload studies showing that the average workload per full-time employee was comparable on the weekend to the workload during the weekday.  Doc. 36-9.  The letter noted that, "Some employees work faster and take on more of the workload than the average indicates.  Therefore, when working alone on the weekend, the workload may appear heavier to some employees [those that work slower] than it actually is." Id.  Ms. Armstrong disputes the workload study and the method used to calculate the average workload per full-time employee.  She maintains that the weekend workload was heavier.

On April 26, 2002, Mr. Mejia offered Ms. Armstrong the option of taking the Friday and Monday off when working the weekend shift, instead of the Thursday and Monday, which were the normal days off for Ms. Armstrong when she worked a weekend shift.  Doc. 36-10.  Ms. Armstrong found the accommodation illusory because being familiar with the preparatory work on

Friday made weekend work easier.[10]

By letter dated June 17, 2002, Mr. Mejia offered further accommodations. Doc. 36-16. Mr. Mejia offered to avoid scheduling Ms. Armstrong on urology clinic weekends, which Mr. Mejia stated would reduce her workload by two hours.[11] Id. Ms. Armstrong viewed this accommodation as illusory because urology had stopped having clinics on weekends, and the lab work for the weekend clinics was done during the week. Doc. 36-17. Mr. Mejia offered to eliminate some of the weekend duties for Ms. Armstrong, specifically environmental cultures that could wait until Monday and the set-up for quality control. Doc. 36-17. The elimination of these duties were purported to reduce the weekend workload by two hours, but according to Ms. Armstrong, these duties required no more than 10 minutes a day. Doc. 24-14 at 60.

On June 18, 2002, Ms. Franklin handed Ms. Armstrong an envelope with materials for her attorney. This happened in the presence of another employee, which Ms. Armstrong found objectionable.

_____

[10] The VA's own records support Ms. Armstrong on this issue. According to a February 7, 2002, memorandum, if a part-time medical technician were hired to help with the weekend workload, the technician would "need to work on Fridays in order to review and familiarize [himself or herself] with the workload for weekend coverage in Microbiology." Doc. 36-11.

[11] The lab chief, Dr. Croker, explains in his affidavit that at the time this accommodation was offered, the urology clinic was expected to open on weekends, but it did no open as contemplated. Doc. 24-7 at ¶ 10.

From September 7 through September 22, 2002, Ms. Armstrong was on leave to attend to her mother's estate in Michigan.

On October 9, 2002, Ms. Armstrong perceived that she was being monitored when she left her work area.  According to Ms. Armstrong, other employees were not monitored.

The VA and Attorney Mutch scheduled a mediation conference to take place on November 4, 2002.  The mediation conference was canceled, however, because Ms. Armstrong was ill from a medical procedure that she underwent on the morning of October 29, 2002.  Doc. 36-22.

By letter dated November 13, 2002, the VA advised Attorney Mutch that it did not consider Ms. Armstrong to be disabled within the meaning of the law. The VA, nevertheless, offered accommodations to Ms. Armstrong.  The accommodations consisted of: (1) an ergonomically correct chair, (2) an effort to schedule Ms. Armstrong to have two consecutive days off each week, and (3) an effort to schedule Ms. Armstrong to have two thirty-minute breaks each shift.[12] Doc. 36-24.  The VA denied any harassment toward Ms. Armstrong.  Id.  The VA also stated that it would accept new medical documentation from Ms. Armstrong and upon receipt would re-evaluate if any other modifications were necessary to

---

[12]  One of these  breaks was the  thirty-minute unpaid lunch that each employee received.  The other break was a grouping of the two fifteen-minute paid breaks that each employee received.  See doc. 36-25.

CASE NO.: 1:05cv205-SPM/AK

accommodate her.  Id.

On December 6, 2003, Ms. Armstrong had surgery to remove an arterial-venous malformation on her lung.  The surgery was not elective and Ms. Armstrong had no control over when it would be scheduled.  In an email dated December 9, 2002, Ms. Franklin directed Ms. Armstrong to provide medical documentation to support her sick leave and threatened to report Ms. Armstrong as AWOL .  Doc. 36-30.  The union president, H. Jody Anderson, responded by letter dated December 10, 2002, that Ms. Armstrong was not required to submit documentation because she had not asked for advanced sick leave.  Doc. 36-29. According to the minutes of a management committee meeting of the lab, medical certification is required only if sick leave exceeds three consecutive workdays.  Doc. 36-31 at 2.

On January 3, 2003, Ms. Armstrong resigned.  Ms. Armstrong contends that she was compelled to resign because the VA would not provide her with any real accommodation and because she was subject to harassment in the workplace.

Starting January 2006, the VA began assigning two medical technicians to a weekend shift to accommodate the heavy workload.  Doc. 37-7.  According to the VA, the number of tests the microbiology lab processed increased significantly from the time Ms. Armstrong worked in the lab (from 67,500 tests in 2002 to 103,749 tests in 2006).  Doc. 40-2.

## II.      STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c). An issue is "material" if it might affect the outcome of the case under the governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  Id.

The burden is on the moving party to show that there are no genuine issues of material fact to be determined at trial.  Mullins v. Crowell, 228 F.3d 1305, 1313 (11th Cir. 2000).  One way to meet the burden is by showing that the non-moving party's case is deficient due to the lack of evidence to support an essential element of the non-moving party's case.  Riley v. Newton, 94 F.3d 632, 638-39 (11th Cir. 1996).  In determining whether this burden has been met, the court views the evidence and all factual inferences in the light most favorable to the nonmoving party, and resolves all reasonable doubts about the facts in favor of the nonmoving party.  Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999).

If the moving party has satisfied its burden, the burden shifts to the nonmoving party who must show "that summary judgment would be

inappropriate because there exists a material issue of fact."  <u>Mullins</u>, 228 F.3d at

1313.  The burden can be met by presenting enough evidence to show that a

reasonable finder of fact could find for the nonmoving party.  <u>Allen v. Tyson</u>

<u>Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997).  The nonmoving party must

present more than a scintilla of evidence in support of its position.  <u>Anderson</u>,

477 U.S. at 254.  The basic inquiry is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law."  <u>Id.</u> at 251.

III.    **TIMELINESS OF EEO CONTACT**

        The VA argues that some of Ms. Armstrong's claims are time-barred

because she did not make a timely contact with an EEO counselor.  A federal

employee filing a claim for unlawful employment practices in district court must

first seek relief from the agency where the unlawful acts were perpetrated.  <u>Grier</u>

<u>v. Secretary of the Army</u>, 799 F.2d 721, 724 (11th Cir. 1986).  This is a condition

precedent to filing suit and "'is part and parcel of the congressional design to vest

in the federal agencies and officials engaged in hiring and promoting personnel

'primary responsibility' for maintaining nondiscrimination in employment.'"  <u>Id.</u>

(quoting <u>Kizas v. Webster</u>, 707 F.2d 524, 544 (D.C. Cir. 1983).  The condition

applies to claims made by federal employees under a variety of federal statutes,

including Title VII[13], the ADA[14], and the Rehabilitation Act[15].  In accordance with

the congressional design, the EEOC adopted regulations for federal employees

to present their claims to the agency.  See 29 C.F.R. § 1614.101 et seq.

These regulations require a federal employee with a discrimination

complaint to contact an EEO counselor from the employing agency within 45

days of the date the alleged discrimination occurs in an effort to resolve the

complaint informally.  See 29 C.F.R. § 1614.105(a).  Unlawful employment

practices occurring more than 45 days before contact with the EEO counselor

are generally time-barred for failure to exhaust administrative remedies.  Brown

v. Snow, 440 F.3d 1259-1264-65 (11th Cir. 2006).

In this case, Ms. Armstrong contacted an EEO counselor on February 27,

2002.  So the potentially time-barred practices are ones that occurred more than

45 days before, that is, on or before January 13, 2002.  This period covers Ms.

Armstrong's complaints about Ms. Franklin's comments after she took ill on

---

[13]   Grier v. Secretary of the Army, 799 F.2d 721, 724 (11th Cir. 1986).

[14]   Zilyett v. Capital One Financial Corp., 179 F.3d 1377, 1339 (11th Cir. 1999) (procedural requirements for Title VII apply to ADA claims).

[15]   Ms. Armstrong argues that she is not required to exhaust administrative remedies for her Rehabilitation Act claims.  Her argument is foreclosed by Doe v. Garrett, 903 F.2d 1455, 1461 (11th Cir. 1990), which holds that "private actions against federal government employers under the Act . . . must satisfy 'the requirement of exhaustion of administrative remedies in the manner prescribed by section [794a(a)(1)] and thus by Title VII.'" quoting Milbert v. Koop, 830 F.2d 354, 357 (D.C. Cir. 1987).

Labor Day Weekend 2000, continuing through the light duty emails, and the
overtime discussions in November and December of 2001.  The potentially
excluded conduct does not encompass Ms. Armstrong's discovery of the first six
ROCs on January 15, 2002; nor does it encompass Ms. Armstrong's first written
request for accommodation, which she made on January 24, 2002.

The potentially time-barred conduct is part of Ms. Armstrong's hostile work
environment claim.  As such, it can be considered even through it occurred 45
days before Ms. Armstrong's EEO complaint.  Nat'l R.R. Passenger Corp. v.
Morgan, 536 U.S. 101, 117 (2002).  This is because none of the conduct at issue
qualifies on its own as an adverse employment action or tangible employment
action (such as termination, demotion, failure to promote, or refusal to hire) that
would be a "separate, actionable, 'unlawful employment practice.'" Id. at 114.
Rather, the conduct is part of a cumulative series of acts that built up to create
the alleged hostile work environment.  Id.

The hostile work environment is deemed to constitute one unlawful
employment practice.  Id.  So long as any act that is part of the hostile work
environment is included in a timely complaint, "the entire time period of the
hostile environment may be considered by a court for the purposes of
determining liability."  Id. at 117.

In this case, while some of the conduct that makes up Ms. Armstrong's
hostile work environment claim occurred more than 45 days before her EEO

CASE NO.: 1:05cv205-SPM/AK

complaint, other acts of alleged harassment (such as the failure of Ms. Franklin to discuss accommodations with Ms. Armstrong, the monitoring of workplace movement, the ROCs, and advance sick leave communications) occurred within the 45-day period or after[16].  All of the conduct may therefore be considered as part of Ms. Armstrong's hostile work environment claim.  Id.  The VA's motion for summary judgment as to this ground will be denied.

## IV.   DISABILITY CLAIMS

The VA contends that it is entitled to summary judgment on Ms. Armstrong's disability discrimination claims[17] because Ms. Armstrong was not disabled.  For the following reasons, the VA's motion for summary judgment will be granted as to this ground.

Not every physical or mental restriction is a disability within the meaning of the law.  The controlling legal definition of disability from the Americans with Disabilities Act contains two parts.  A disability is "[1] a physical or mental impairment that [2] substantially limits one or more of the major life activities of

---

[16]  The alleged acts of harassment committed after Ms. Armstrong filed her EEO complaint are properly considered because they were reasonably included in the administrative investigation of her charge of discrimination.  Baker v. Buckeye Cellulose Corp., 856 F.2d 167, 168-69 (11th Cir. 1988).

[17]  Ms. Armstrong has brought her disability claims only through the Rehabilitation Act and not the parallel provisions of the Americans with Disabilities Act.  The same standards apply no matter how the claims are brought.  29 U.S.C. § 794(d); Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000).

such individual." 42 U.S.C. § 12102(2). For purposes of summary judgment, the

Court will presume that Ms. Armstrong's fibromyalgia and ulcerative colitis are

physical impairments so as to satisfy the first part of the definition of disability.

The second part of the definition requires Ms. Armstrong to show that her

impairments result in a substantial limitation of one or more major life activities.

Ms. Armstrong states that her impairments affect her ability to bathe, style her

hair, eat, prepare food (stirring, grating, lifting heavy pans), breathe, learn, work

around the home (gardening, cleaning, laundry), have sex, and engage in

hobbies (cross stitch and martial arts). Doc. 37-6 at ¶ 41. She explains that:

> I used to wash my hair everyday; now I only do so every three (3)
> to ten (10) days. I use[d] to blow dry, and curl or straighten my hair;
> now I let it dry naturally, and dislike the way it looks, because I can't
> blow dry it very easily. I do not bathe daily; I am too fatigued to do
> so. I earned a first degree black belt in the Korean martial art Tae
> Kwon Do and was approaching testing for my second degree black
> belt; I had to stop practicing the art in 1994 due to pain and fatigue.
> I could not have sexual relations with my now ex-husband often
> enough due to pain and fatigue. I use[d] to dust my furniture every
> week; it might get done now about four (4) times a year. I use[d] to
> wash my floors every week on my hands and knees; it now gets
> done maybe three (3) times per year. I use[d] to love to mow the
> acreage around the house, I can't recall the last time I did that. I
> too often have to spend an entire evening, entire day, or entire
> weekend sleeping due to the fibromyalgia symptoms thus missing
> out on life period.

Doc. 37-6 at 34-5. Ms. Armstrong's description shows that her fibromyalgia

restricts the duration and frequency of her performance of a variety of activities.

She retains the ability to perform many activities but she has difficulty sustaining

or repeating the activities due to tiredness or pain.  Similarly, Ms. Armstrong

maintains that she was able to perform her job duties as a medical technologist,

but that she had difficulty sustaining the weekend duties.  Id. at 31-32, Doc. 37-5

at ¶ 8.

Ms. Armstrong's description shows that she previously enjoyed a high-

level of activity–advanced martial arts, vigorous house cleaning, and yard work.

Her impairments have made it impossible to sustain that level of activity.  A

person's own diminished activity tolerance does not constitute a substantial

limitation, however.  Chandra v. Englehard, 234 F.3d 1219, 1222 (11th Cir. 2000)

("[D]iminished activity tolerance for normal daily activities such as lifting, running

and performing manual tasks, as well as a lifting restriction, did not constitute a

disability under the ADA.").  The relevant comparison for determining whether

Ms. Armstrong is substantially limited is whether she is afflicted in a way that is

different from what many other adults suffer.  Garrett v. Univ. of Ala., 507 F.3d

1306, 1315 (11th Cir. 2007).

When asked to provide a statement of functional abilities, Ms. Armstrong's

primary care physician noted that her only restrictions were lifting over 20 pounds

and working the rotating weekend schedule.  Doc. 24-14 at 50, 24-14 at 5, ¶ 17.

No other restrictions were stated and no explanation was given.  Id.

A substantial impairment within the meaning of the law is one that

"prevents or severely limits the individual from doing activities . . . ."  Toyota

Motor Mfg. v. Williams, 534 U.S. 184, 198 (2002).  The impairment must be long-term or permanent.[18]  Id.  To be found substantially limited in major life activities, one must meet a "demanding standard."  Id. at 197.

For example, an individual who had to avoid sweeping, quit dancing, needed occasional help dressing, and had to reduce how often she played with her kids, gardened, and drove long distances was not deemed substantially limited in major life activities.  Id. at 202.  An individual who could not walk more than a mile, could not jog, and had to pace himself slowly when climbing stairs was not deemed substantially limited.  Kelly v. Drexel Univ., 94 F.3d 102, 106 (3d Cir. 1996).  An individual who had partial paralysis, muscle weakness, uneven legs, difficulty climbing stairs, and walked slowly was not deemed substantially limited.  Stone v. Entergy Servs., No. 94-3669, 1995 WL 368473 (E.D. La. June 20, 1995).  An individual who could not grasp or manipulate an item, or carry more than a few pounds, but could still make meals, comb her hair, and drive was not deemed substantially limited.  Outzts v. U.S. Air, Civ. A. No. 94-625, 1996 WL 578514 (W.D. P.A. July 26, 1996).  An individual who could not lift more

---

[18]  A sporadic or temporary impairment will not constitute a disability.  Reis v. Universal City Development Partners, Ltd., 442 F.Supp. 1238, 1244 (M.D. Fla. 2006); Kay v. Lester Coggins Trucking, Inc., 141 Fed. Appx. 824, 827 (11th Cir. 2005).  The VA contends that Ms. Armstrong failed to show that her fibromyalgia or ulcerative colitis were permanent or long-term conditions.  The evidence in the record, however, is sufficient to make a finding that they were.  Accordingly, to the extent the VA seeks summary judgment on this ground, the motion is denied.

than ten pounds was not substantially limited.  Hilburn v. Murata Electronics N.A., 181 F.3d 1220, 1228 (11th Cir. 1999).

"[S]omeone who walks, sits, stands or sleeps 'moderately below average' is not disabled under the Act."  Rossback v, City of Miami, 371 F.3d 1354, 1358 (11th Cir. 2004).  Someone who can care for herself, that is, dress, bathe, and perform household chores, is generally not substantially limited.  Greenberg v. BellSouth Telecomm. Inc., 498 F.3d 1258, 1264 (11th Cir. 2007).  Ms. Armstrong can bathe and dress herself and perform household chores, albeit not to the standard she would if she felt better.  Ms. Armstrong maintains that in spite of her impairments, she was able to perform her full-time job as a medical technologist. She in fact did so until she resigned.

Based on the record before the Court, no reasonable jury could find that Ms. Armstrong's physical impairments substantially limit a major life activity.  The VA is therefore entitled to summary judgment on Ms. Armstrong's disability claim.

## V.   HARASSMENT

To establish a claim for harassment, also known as hostile work environment, Ms. Armstrong must prove that: (1) she belongs to a protective class, (2) suffered unwelcome harassment (3) that was based on a discriminatory motive and (4) was severe or pervasive, and (5) that the VA is directly or vicariously liable for the harassment.  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).  The VA contends that it is entitled to summary

judgment because Ms. Armstrong cannot show the third and fourth parts of her claim; that is, she cannot show that she suffered harassment based on a protected characteristic and she cannot show that any harassment was severe or pervasive.

### A.    Protected Characteristic

Ms. Armstrong contends that she was harassed based on her protected characteristics of age, gender, and disability.  As stated above, Ms. Armstrong cannot establish that she is disabled.  She therefore cannot sustain a case for disability harassment.  See Steele v. Thiokol Corp., 241 F.3d 1248, 1253 (10th Cir. 2001) (a plaintiff must qualify as disabled under the ADA definition to bring a disability harassment claim); Burgos v. Chertoff, No. 07-12954, 2008 WL 1808370, at *2 (11th Cir. Apr. 23, 2008) (same).

As for age and gender, there is no evidence of discriminatory motive in the record.   Ms. Armstrong has not shown that the VA treated similarly situated persons who were male or younger differently or better than it treated her.  See Reeves v. C.H. Robinson Worldwide, Inc., No. 07-10270, 2008 WL 1848882, at *3, 12 Fla. L. Weekly Fed. C. 636 (11th Cir. Apr. 28, 2008) (to show discriminatory motive for a hostile work environment claim, a plaintiff must show that similarly situated persons not of the protected class were treated differently or better).  Although Ms. Armstrong attempts to compare her situation to other employees, this is in relation to her claim that she should have received an

accommodation.  To the extent refusal to provide an accommodation to someone who is not disabled can be deemed harassment, the VA has demonstrated that these employees are not similarly situated to Ms. Armstrong either because they never asked for nor received any accommodation, or worked in a different section, or had different supervisors.  See doc. 24 at 28-30.

Most  of the harassment complained of by Ms. Armstrong was committed by her supervisor, Ms. Franklin.  There was nothing about Ms. Franklin's conduct, however, to show that she acted based on Ms. Armstrong's gender or age.  Accordingly the VA is entitled to summary judgment on this ground.

### B.      Severe or Pervasive

The Supreme Court described the kind of severe or pervasive harassment that is necessary to support an actionable claim under Title VII:

> [I]n order to be actionable under the statute, a sexually [or age or disability based] objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.  We directed courts to determine whether an environment is sufficiently hostile or abusive by "looking at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." . . . [O]ffhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the "terms and conditions of employment."

Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (internal citations omitted).   The Court has imposed a high standard and taken pains to "ensure

that Title VII does not become a 'general civility code.'" Id. at 788 (quoting Oncale v. Sundowner Offshore Services, 523 U.S. 75, 81 (1998)).

In Ms. Armstrong's case, the conduct she complains of fails to meet the standard because it does not rise beyond what is normal for many workplaces. "Employer criticism, like employer praise, is an ordinary and appropriate feature of the workplace.  Expanding the scope of Title VII to permit discrimination lawsuits predicated only on unwelcome day-to-day critiques and assertedly unjustified negative evaluations would threaten the flow of communication between employees and supervisors and limit an employer's ability to maintain and improve job performance."  Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1242 (11th Cir. 2001).

Ms. Armstrong suffered no diminishment in pay or benefits.  She did not even receive a negative job evaluation.  Ms. Armstrong's supervisor may have been unsympathetic to her situation and reacted in frustration at times.  Such "ordinary tribulations in the workplace" are not actionable, however.  Id. at 1238-39.  Accordingly, the VA is entitled to summary judgment on this ground.

## VI.    RETALIATION

To make a prima facie case of retaliation for opposing an unlawful employment practice a plaintiff has to show (1) opposition to an unlawful practice; (2) adverse employment action against the plaintiff; and (3) a causal connection. Williams v. Motorola, 303 F.3d 1284, 1291 (11th Cir. 2002).  The VA argues that

Ms. Armstrong's retaliation claim must fail because she did not suffer an adverse employment action.

In the context of a retaliation claim, a more liberal standard for adverse employment action applies.  <u>Crawford v. Carroll</u>, No. 04-00089, 2008 WL 2246677 (11th Cir. June 3, 2008).  The standard is met by showing that the plaintiff suffered a materially adverse action, that is action that "might deter a reasonable employee from pursuing a pending charge of discrimination or making a new one."  <u>Id.</u>  Even under this liberal standard, Ms. Armstrong cannot support her retaliation claim.

An employee's decision to oppose an unlawful employment practice does not "immunize the employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  <u>Burlington N. & Santa Ry Co. v. White</u>, 548 U.S. 53, 68 (2006).  In assessing the seriousness of the alleged retaliatory conduct, an objective standard applies.  <u>Id.</u> at 68-69.

In this case, as explained above, the alleged retaliatory conduct does not rise beyond the level of ordinary workplace supervision.  Although Ms. Armstrong may have felt that she was treated badly by Ms. Franklin and others at the VA, at most their conduct was a "simple lack of good manners."  <u>Id.</u> at 68.  The conduct does not rise to the level of material adversity that is necessary to support a retaliation claim.  Accordingly, the VA is entitled to summary judgment on this ground.

**VII.    CONCLUSION**

Ms. Armstrong's claims are not subject to dismissal for untimely contact

with an EEO counselor.  The VA, however, is entitled to summary judgment on

grounds that Ms. Armstrong is not disabled, she cannot show severe or

pervasive harassment based on a protected characteristic, and she cannot show

materially adverse action to support a retaliation claim.  Since Ms. Armstrong has

no viable claims for trial, it is

ORDERED AND ADJUDGED:

1.      The VA's motion for summary judgment (doc. 24) is granted.

2.      The clerk shall enter judgment for the VA and against Ms.

Armstrong on all of her claims.

DONE AND ORDERED this 4th day of June, 2008.

_s/ Stephan P. Mickle_

Stephan P. Mickle
United States District Judge